IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

HER, INC., et al.,
    Plaintiffs,

v.

Case No. 2:06-CV-492
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Norah McCann King

RE/MAX FIRST CHOICE, LLC, et al.,
    Defendants.

OPINION AND ORDER

This matter is before the Court for consideration of the Plaintiffs' Motion for Judgment on counts I and III of the Complaint (Doc. #62) and the Defendants' Motion for Judgment on their counterclaim. (Doc. #64). For the reasons that follow, the Plaintiffs' motion is granted and the Defendants' motion is denied.

I.

On January 5, 2007, this Court issued a Preliminary Injunction Order precluding Defendants RE/MAX First Choice, LLC ["RE/MAX"] and David E. Barlow ["Barlow"][1] from using certain Internet domain names that incorporated Plaintiffs' personal names and registered marks. Plaintiffs in this action are: HER, Inc., a Midwest real estate firm that provides residential real estate brokerage services and information to the public; Harley Rouda, Jr., Chief

---

[1] Defendant RE/MAX is a limited liability company organized under the laws of the State of Ohio. RE/MAX is a licensed real estate brokerage company. Defendant Barlow is a licensed real estate agent and he was employed by Plaintiff Real Living, Inc. from 1998 to 2004. Barlow is currently an agent for Defendant RE/MAX, First Choice, LLC.

Executive Officer, General Counsel and Managing Partner of Real Living, Inc.; and Kaira Sturdivant-Rouda, Chief Operating Officer of Real Living, Inc., and the spouse of Harley Rouda, Jr.

Plaintiffs seek Judgment on Count I of their Complaint, which alleges violation of the Anti-Cybersquatting Consumer Protection Act ["ACPA"], § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), and on Count III of their Complaint, which alleges service mark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114. Defendants oppose the motion and seek Judgment on their counterclaim, which alleges violation of Ohio R.C. § 4165.02(A)(7). The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367. By agreement of the parties, the record in this case consists of the testimony and exhibits admitted at the preliminary injunction hearing as well as the deposition of David E. Barlow.

## II.

The following facts are derived from the evidence adduced at the preliminary injunction hearing. Since 1977, the term "HER" has been a registered trademark with the United States Patent and Trademark Office. (Prelim. Inj., Pl. Exhibit 4). Plaintiffs' other registered trademarks include: "REAL LIVING," RELAX WITH REAL LIVING," and "IT'S GOT TO BE REAL." (Prelim. Inj., Pl. Exhibits 5, 6). Plaintiffs assert that the names "Harley E. Rouda, Sr.," "Harley E. Rouda, Jr.," and "Kaira Sturdivant-Rouda" are synonymous with HER and REAL LIVING.

This case arises as a result of circumstances which took place in late April and early May 2006. At that time, agents of HER received an e-mail from "Herbie R Jr." ["Herbie"], using the e-mail address "herbie@INSIDEREALLIVING.COM." (*Stipulation* at ¶ 2). Plaintiffs claim that

2

the e-mail was sent to nearly seven hundred HER real estate agents. The e-mail, entitled

"'Inside' Real Living 'and the Truth shall set you free,'" purported to be an insider's look into

the dealings of HER and its leadership. The body of the message states:

> Welcome to the first edition of "Inside" Real Living where from time to time we will show you the "Inside" dealings and the back door deals of HER Real Living and it's [sic] leadership.
>
> Did you know that the HER Real Living web site is one of the least accurate web sites on the Internet when it comes to having a complete inventory of homes available for your clients to see?
>
> Yes it is true, your boss's [sic] Harley Jr and Kaira Sturdivant-Rouda pick and choose which of their competitors [sic] homes show up on their HER Real Living web site so when your clients are searching for their next home they will not see all homes in the MLS.
>
> Listings by Top Agents Jack Travis, Patti Good, Dave Barlow and Susan Beckley just to name a few agents whose listings are not showing up on the HER web site because Harley Jr and Kaira Sturdivant-Rouda are playing games with your livelihood and have decided on your behalf not to display these top agent listings and many others [sic] agents who just like them have recently left HER.
>
> It truly is sad, said one unidentified HER agent, that I have to tell my clients to go to another web site like Century21.com, REMAX.com or Kingthompson.com so my clients can see the all [sic] of the listings of homes available in Columbus.
>
> I can't afford to tell my Clients to only use the HER web site when many of the best homes for sale are not even showing up. I'm am [sic] potentially losing money anytime I send one of my clients to the HER web site because my clients can't search the entire MLS.
>
> The competition is finding the better homes quicker and beating my buyers to them because my clients who are using the HER web site are not even seeing some of the best homes on the market. Now I know why my numbers have been going down, because my clients are not even getting the whole picture because Harley Jr and Kaira Sturdivant-Rouda are playing games and acting like little kids holding some sort of grudge against former agents and it is costing me money!
>
> It's hard enough to find your clients the perfect home without having your own company working against you. Don't let Harley Jr and Kaira Sturdivant-Rouda

3

> cheat your clients out of seeing the latest listings. Ask your Boss's [sic] to include all listings in the MLS on HER web site so your clients will have a chance at buying every home available in the MLS and you will have a chance to collect a commission check.
>
> Now that you now know the truth, next time your clients ask which web site is the best web site to find homes on please go ahead and tell them to search on the Century 21, REMAX or King Thompson web sites, at least those web sites have all of the listings available for your clients to see & buy.
>
> Now you know the Inside story. Stay tuned for further editions.
>
> Your friend and insider
>
> Herbie R Jr

(Prelim. Inj., Pl. Exhibit 13).

Following this e-mail, Plaintiff Harley Rouda, Jr. received numerous phone calls and e-mails inquiring as to the validity of the e-mail message. In response to the e-mail, HER asked Mark Williams, the Senior Systems Administrator for HER Real Living, Inc. to investigate the source of the "Inside" Real Living e-mails. Williams traced the e-mail to a computer named "Dads_laptop," which utilized a server provided by Time Warner/Road Runner high speed internet. After comparing the information from e-mails sent by "Herbie" and those sent from the e-mail addresses "dbarlow@barlow.com" and "dave@firstchoice.columbus.rr.com," Williams concluded that the Herbie Jr e-mails had originated from the same computer as the e-mails sent from "dbarlow@barlow.com" and "dave@firstchoice.columbus.rr.com."

In early June 2006, agents of HER received a second e-mail, similar to the first. The sender, however, had altered certain information, which bypassed HER's e-mail security settings. The sender this time was "HJR," and the corresponding e-mail address was, "herbie@INSIDERREALLIVING.COM." (Prelim. Inj., Pl. Exhibit 14). The second e-mail

emphasized a phrase on the HER website, which stated, "See all homes for sale - Not just our listings." The second e-mail restated an allegation made in the first e-mail, namely that HER's advertisement was "a lie" because HER had deleted the listings of RE/MAX agents Jack Travis, Dave Barlow, Patty Good and Susan Beckley as well as those of 150 other agents from RE/MAX Town Center. (*Id.*).

Following the June 2006 e-mail from "Herbie," HER changed the complained of advertisement from "see all the homes" to "see virtually all the homes." Plaintiffs assert that the e-mails sent by "Herbie" were false in stating that HER was not listing the information for properties listed for sale by agents Jack Travis, Patti Good and Susan Beckley. (Prelim. Inj., Pl. Exhibit 21).

Defendant Barlow acknowledges responsibility for the "Inside Real Living" e-mails sent from the computer named "Dads_laptop." (*Stipulation* at ¶ 2). Barlow also admits that he registered and used the Internet domain name "www.insiderealliving.com," which displayed the same information embedded within the e-mail from "Herbie R Jr." (*Stipulation* at ¶ 1). In addition to the "www.insiderealliving.com" website, Barlow has registered the following domain names: "www.harleyroudajr.com, www.harleyerouda.com, www.harleyroudasr.com, www.kairarouda.com and www.kairasturdivantrouda.com." (*Id.*). During the preliminary injunction hearing, Plaintiff Harley Rouda, Jr. testified that when a user visited one of these website domains, he or she would be diverted to the website of Defendant RE/MAX First Choice. This testimony describing the diversion to the RE/MAX website is undisputed, although Barlow testified that the diversion was unintentional.

Rouda also testified that if a person were attempting to reach his actual website, which is

5

"www.harleyrouda.com,"[2] such person might accidentally type the wrong domain address and find him or herself at the RE/MAX website. Plaintiffs also contend that consumers would confuse Barlow's website www.insiderealliving.com with HER's web site: "www.realliving.com." Barlow registered the domain names at issue in February 2006 through the website "1+1.com."

Barlow maintains, as he did at the preliminary injunction stage, that the sole use of the domain names in question was to provide legitimate criticism of Plaintiffs for alleged misrepresentations on the HER web site. Following the preliminary injunction hearing, this Court concluded that, while Barlow clearly has a First Amendment right to engage in criticism of Plaintiffs, the method in which he chose to exercise this right ran afoul of the ACPA and was not protected speech. Thus, the Court held that Plaintiffs were likely to succeed on the merits of their ACPA claim as well as their claim under

§ 32 of the Lanham Act. The Court now considers whether Plaintiffs are entitled to final Judgment in their favor on these claims and whether Defendants are entitled to Judgment on their counterclaim.

### III.

### A. Plaintiffs' Claim for Violation of the ACPA

The Anti-Cybersquatting Consumer Protection Act ["ACPA"], 15 U.S.C. § 1125(d),

---

[2]Unlike the domain addresses that Barlow registered, Harley Rouda, Jr.'s actual website address lacks the insertion of his middle initial "e" or the suffixes "jr," or "sr." As the Court held in its Preliminary Injunction Order, this does not preclude the domain name from being confusingly similar to the Plaintiffs' marks.

states, in relevant part:

> (d) Cyberpiracy prevention
> (1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> (ii) registers, traffics in, or uses a domain name that--
> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
> (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d)(1)(A). The ACPA, which prohibits "cybersquatting," is an amendment to the Lanham Act. In order to successfully establish a claim for violation of the statute, the Plaintiffs must show: (1) they have a valid trademark entitled to protection; (2) the mark is distinctive or famous; (3) the Defendants' domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the Defendants used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. *Id.*, citing *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 546 (6th Cir. 2003).

The Court observes at the outset that no additional evidence has been adduced since the record was developed at the preliminary injunction stage. The Court considers the evidence of record as it applies to each of the foregoing elements for a claim under the ACPA.

Specifically, with respect to the first element of the claim, the Court finds that Plaintiffs have valid trademarks which are entitled to protection. It is undisputed that HER was registered as a trademark in 1977. (Prelim. Inj., Pl. Exhibit 4). From the evidence presented, the Court finds that the name "HER" is readily identifiable as the trademark of one of the largest real estate

7

companies in Central Ohio. REAL LIVING was registered as a trademark on December 20, 2005. (Prelim. Inj., Pl. Exhibit 5). This name too is readily identifiable as the trademark of the same real estate company. The Court also finds, for purposes of Plaintiffs' claim, that the personal names of Plaintiffs, Harley E. Rouda, Sr., Harley E. Rouda, Jr. and Kaira Sturdivant-Rouda, are worthy of trademark protection. Although personal names ordinarily are not protected, they become distinctive and worthy of protection by trademark law if there is proof that the names have attained secondary meaning, *i.e.*, a "long association of the [personal] name with the business . . . [making] the name and the business become synonymous in the public mind . . . ." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 13:2 (4th ed. 2004).

The evidence of record shows that Plaintiffs' names are personally recognized by the public as being synonymous with the HER real estate business[3]. The names of the individual Plaintiffs have been regularly and frequently used in extensive marketing of HER and Real Living and the names have acquired secondary meaning, at least within the Central Ohio real estate market. In addition, the evidence before the Court establishes that Real Living has acquired a secondary meaning by which consumers associate it with a particular provider or source, that being HER real estate. In sum, the names HER, REAL LIVING, together with the Plaintiffs' personal names are worthy of trademark protection.

With respect to the second element, the evidence of record shows that Plaintiffs' marks are distinctive or famous. The HER mark and the REAL LIVING mark, which are registered, are

---

[3]HER denotes the initials of both Harley E. Rouda, Sr. and Harley E. Rouda, Jr. Kaira Sturdivant-Rouda's name is associated with the Real Living brand, which she began in September 2002. Her resume and name appear on the website. (Prelim. Inj., Pl. Exhibit 2).

clearly distinctive. In addition, the Plaintiffs' personal names are distinctive by virtue of the secondary meaning they have acquired. A mark is distinctive and capable of protection by the trademark law if it is either "inherently distinctive" or it "has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

As to the third element, the Court finds that the domain names used by Defendants are confusingly similar to and dilutive of Plaintiffs' marks. In making this determination, the Court is to make a "direct comparison between the protected mark and the domain name itself," rather than an assessment of the context in which each is used or the content of the offending web site. *Northern Light Technology, Inc. v. Northern Lights Club*, 97 F.Supp.2d 96, 117 (D. Mass.2000). The Defendants' domain names identified in the Complaint are: "www.insiderealliving.com;" "www.harleyroudajr.com;" "www.harleyerouda.com;" "www.harleyroudasr.com;" "www.kairarouda.com;" and "www.kairasturdivantrouda.com." Defendants' use of the Plaintiffs' personal names as well as the Real Living mark is clearly confusing as it creates the appearance that Plaintiffs have permitted the use of the trademarks and names by the Defendants. The use also dilutes the Plaintiffs' marks. As this Court earlier held, the addition of the word "inside" to the "realliving" domain name does not eliminate confusion.

The fourth element of a claim under the ACPA, that the Defendants used, registered, or trafficked in the domain name, is undisputed.

With respect to the fifth element, the Court considers whether the Defendants' use was done with a bad faith intent to profit. 15 U.S.C. § 1125(d)(1)(B)(i) outlines the factors for the Court to consider in determining whether a bad faith intent to profit is shown:

(I) the trademark or other intellectual property rights of the person, if any, in the

9

domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of [the Act].

15 U.S.C. § 1125(d)(1)(B)(i). As this Court earlier recognized, the foregoing factors are not exhaustive of the analysis of whether Defendants acted with a bad faith intent to profit. The Court may also consider "unique circumstances . . . which do not fit neatly into the specific factors enumerated by Congress." *Sporty's Farm LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489,

10

Case: 2:06-cv-00492-EAS-NMK Doc #: 65 Filed: 05/02/08 Page: 11 of 19 PAGEID #: 660

499 (2nd Cir. 2000).

As to the first factor, the undisputed evidence shows that Defendants have no intellectual property right in the domain names. Second, the domain names consist of the Plaintiffs' business or personal names. Third, Defendants had no prior use of the domain names for a bona fide offering of goods or services. As observed in *Victoria's Secret Stores v. Artco Equipment Co., Inc.*, 194 F.Supp.2d 704, 722 (S.D. Ohio 2002) (Smith, J.), quoting *E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657, 1675 (E.D. Cal.1989), "a presumption of bad faith arises where 'the senior user's trademark is famous in the marketplace and where the junior user was aware of the trademark and of its fame. . . . In these cases, 'it is inferrable that the junior user adopted the mark for the purpose of profiting from the aura of goodwill surrounding the senior user's mark.'"

As to the fourth factor, the Court notes that Defendants have criticized the Plaintiffs, but only in conjunction with commercially related speech. As this Court earlier concluded, this factor does not weigh in favor of the Defendants, not because their First Amendment rights are to be trivialized, but by the fact that a "bona fide" use of the mark implies a legitimate, noncommercial purpose. Since Defendants are in direct business competition with the Plaintiffs, and the use of the trademarks and tradenames is related to Defendants' business, the fourth factor weighs in favor of the Plaintiffs.

With regard to the fifth factor, the evidence demonstrates that Defendants diverted at least some users to a site accessible through the domain name in a manner that could harm the goodwill of Plaintiffs' marks by creating confusion as to the source of the domain names. Barlow testified at the preliminary injunction hearing that he did not intend to divert users to the RE/MAX website, but rather intended the domain names to lead users to the

"www.insiderealliving.com" website. As this Court earlier held, the effect of Barlow's action is the same. The diversion created confusion because the domain names used were identical to or nearly identical to the Plaintiffs' personal and professional names. Further, the diversion served to harm the goodwill of Plaintiffs' marks.

In addition, this Court earlier concluded that the Defendants had at least the hope of achieving some commercial gain[4]. In the Court's view, irrespective of any gain which may or may not have been realized, the statute states that the diversion can be "either for commercial gain or with the intent to tarnish or disparage the mark . . ." in order to show a bad faith intent to profit. 15 U.S.C. § 1125(d)(4)(B)(i)(V). The evidence demonstrates that Barlow's site was designed with a long-term financial motive in mind. The Court notes that, in opposing Plaintiffs' Motion for Judgment, Defendant Barlow again contends that he did not act with a bad faith intent to profit because he allegedly wanted to reveal that the HER website was inaccurate, because not all the homes for sale could be viewed by accessing the Plaintiffs' website[5]. In the Court's view, this explanation does not overcome the evidence that Barlow acted with a long-term financial goal in mind. The Court finds in favor of the Plaintiffs on the fifth factor.

The Court's findings at the preliminary injunction stage with respect to the remaining factors remain unchanged. Specifically, as to the sixth factor, there is no evidence that the

---

[4] Defendant Barlow stated in an e-mail sent to all agents working for HER that he was "potentially losing money anytime I send one of my clients to the HER website. . . [n]ow I know why my numbers have been going down . . . ." (Prelim. Inj., Pl. Exhibits 11 and 13)

[5] The Court notes that, on deposition subsequent to the Preliminary Injunction, Barlow testified that he wanted to "prove a point" to Plaintiffs by registering the various domain names. In particular, Barlow desired to embarrass Plaintiffs by showing that they were "not smart enough . . . to register their own names." (*Barlow Depo.* at 13).

12

Defendants offered to transfer, sell, or otherwise assign the domain names to the Plaintiffs for financial gain[6]. Regarding the seventh factor, the evidence of record is not conclusive as to whether the Defendants used false or misleading information when applying for registration of the domain names. With respect to the eighth factor, there is ample evidence that, at the time Defendant Barlow registered the multiple domain names, he knew they were distinctive of Plaintiffs' marks and personal identity, without regard to the goods or services of the parties. Finally, as to the ninth factor, it is clear that the Plaintiffs' marks are distinctive or famous.

In sum, the Court finds that the evidence of record establishes Defendants' violation of the ACPA. The Plaintiffs are entitled to Judgment in their favor on Count I of the Complaint[7].

## B. Plaintiffs' Claim for Violation of § 32 of the Lanham Act

Plaintiffs also move for Judgment on their claim for violation of § 32 of the Lanham Act, 15 U.S.C. § 1114. A claim for trademark infringement under § 1114 requires a showing of the following: (1) ownership of a valid, protectable trademark; (2) that Defendant used the mark in commerce and without the registrant's consent; and (3) there is a likelihood of consumer confusion. *Too, Inc. v. TJX Cos.*, 229 F. Supp.2d 825, 829 (S.D. Ohio 2002). The registrant does not need to prove intent in order establish liability. *Abercrombie & Fitch v. Fashion Shops*

---

[6]The Court disagrees with Defendant Barlow that the absence of evidence in this regard precludes a showing of cybersquatting under the ACPA. No single factor can determine whether Defendants acted with a bad faith intent to profit. *Sporty's Farm LLC v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 499 (2nd Cir. 2000).

[7]In reaching this conclusion, the Court adheres to the findings made earlier with respect to Defendants' First Amendment challenge.

13

*of Kentucky, Inc.*, 363 F. Supp. 2d 952, 957 (S.D. Ohio 2005).

In considering whether there is a "likelihood of confusion," the Court examines the following eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir.1982). The foregoing factors "'imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful.'" *Abercrombie & Fitch*, 363 F.Supp.2d at 959, quoting *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 249-50 (6th Cir.2003). The ultimate question is "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Daddy's Junky Music Stores Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997).

As this Court earlier held, the undisputed evidence shows that Plaintiffs have a valid, protectable mark and that Defendant Barlow used the mark in commerce without the Plaintiffs' consent. The Court further concludes that Plaintiffs have established a likelihood of confusion. With respect to the various factors, the Court first finds that Plaintiffs are owners of a strong mark; second, the parties are both involved in the sale of real estate; third, the domain names used by Defendant Barlow are similar, if not nearly identical, to the Plaintiffs' personal names and marks; fourth, there is evidence of actual confusion by those who received Defendant Barlow's e-mails; fifth, the parties use the same marketing channels; sixth, users are unlikely to know that Defendant Barlow's use of domain names was not authorized by Plaintiffs; and

14

seventh, Defendant Barlow selected the domain names to be similar if not identical to Plaintiffs' names and marks. The eighth factor, likelihood of expansion of the product lines, is inapplicable to this case.

In sum, based on the evidence of record, the Court concludes that Plaintiffs are entitled to Judgment on Count III of their Complaint for violation of § 32 of the Lanham Act.

### C. Defendants' Counterclaim

Defendants move for Judgment on their counterclaim, which alleges violation of R.C. § 4165.02(A)(7). The statute is entitled "Deceptive Trade Practices" and states, in relevant part:

> (A) a person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following:
>
>    *     *     *
>
> (7) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have . . . .

Defendant Barlow contends that Plaintiffs' website is false and misleading because it allegedly did not identify "all" the homes for sale in the Central Ohio area. Barlow asserts that he is entitled to Judgment on this claim.

As this Court earlier observed at the Preliminary Injunction stage, "[t]he Ohio Deceptive Trade Practices Act is substantially similar to section 43(a) of the Lanham Act [15 U.S.C. § 1125(a)] . . . . In fact, an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F.Supp. 1417, 1431 (S.D. Ohio

15

1990) (Kinneary, J.) (citations omitted).

In order to succeed on a claim for false and misleading advertising under the Ohio Deceptive Trade Practices Act, the Plaintiff must show:

> (1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

*Reed Elsevier, Inc. v. TheLaw.net Corp.*, 269 F.Supp.2d 942, 951 (S.D. Ohio 2003) (Rice, J.), citing *American Council of Certified Podiatric Physicians and Surgeons v. American Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir.1999); *Cesare v. Work*, 36 Ohio App.3d 26 (1987).

In this case, even assuming Defendant Barlow has shown that the Plaintiffs' website was false or misleading because it stated that one could view "all" the homes for sale, when Defendant Barlow's listings were not included, Barlow comes forward with no evidence to support any of the foregoing factors. Specifically, the record is devoid of evidence that the allegedly misleading statement deceived or tended to deceive a substantial portion of the real estate buying audience; that the statement was material in that it likely influenced the deceived audience's purchasing decisions; and that there was some causal link between the allegedly deceptive statement and harm to Barlow. In the absence of any evidence to support these elements of the counterclaim, the Court declines to enter Judgment in favor of Defendants.

16

## IV.

In view of the Court's conclusion that Plaintiffs are entitled to Judgment on Counts I and III of their Complaint, the Court now addresses Plaintiffs' request for permanent injunctive relief as well as the request for statutory damages under 15 U.S.C. § 1117(d).

With respect to the latter, statutory damages are available for a violation of the ACPA, § 1125(d)(1). Section 1117(d) provides:

> In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

Plaintiffs request statutory damages in excess of $200,000. Plaintiffs also request an award of attorneys' fees and costs under § 1117(a). Since the parties have not yet briefed the issue of attorneys' fees and costs, the Court will defer ruling on the request for statutory damages until after the attorneys' fees and costs issue is briefed. To this end, the Plaintiffs shall file a motion for attorneys' fees and costs by **May 19, 2008.** The Defendants shall respond within **twenty (20) days** thereafter.

The Court finds that Plaintiffs are entitled to permanent injunctive relief on Counts I and III of the Complaint. As a result, the Defendants, and all persons acting for, with, by, through or under any of them are hereby **PERMANENTLY ENJOINED** from directly or indirectly doing each of the following:

1. Using "insiderealliving.com," "harleyroudajr.com," "harleyerouda.com," "harleyroudasr.com," "kairarouda.com," "kairasturdivantrouda.com," or any other name or mark confusingly similar thereto, alone or in combination with the other word or words, as a

17

trademark, service mark or trade designation;

2. Using "insiderealliving.com," "harleyroudajr.com," "harleyerouda.com," "harleyroudasr.com," "kairarouda.com," "kairasturdivantrouda.com," or any confusingly similar domain name, as a domain name for Defendants' business or other commercial activities;

3. Engaging in any acts that are likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, or association of any of the Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of any of the Defendants' services or commercial activities by Plaintiffs;

4. Engaging in any trade practice whatsoever that tends to unfairly compete with or injure Plaintiffs' names and marks, services and business related thereto, including goodwill appertaining to Plaintiffs' names and marks;

5. Engaging in any trade practice whatsoever that tends to dilute the distinctive qualities of Plaintiffs' names and marks, injure Plaintiffs' business reputation and ability to maintain their competitive position in the marketplace with respect to the use of their names and marks, and otherwise engage in any practice that serves to diminish the public's association of "Real Living," "HER," Harley Rouda, Jr., Kaira Sturdivant-Rouda, or Harley E. Rouda, Sr. exclusively with Plaintiffs; and

6. Using or adopting any corporate name that contains "Real Living" or any of the complained of names or marks herein or any name, mark or designation confusingly similar thereto.

### V.

For the foregoing reasons, the Plaintiffs' Motion for Judgment on Counts I and III of the Complaint (**Doc. #62**) is **GRANTED**. The Defendants' Motion for Judgment on their counterclaim (**Doc. #64**) is **DENIED**.

The Defendants shall adhere to the directives set forth in section IV, *supra*. Plaintiffs shall file a motion for attorneys' fees and costs by **May 19, 2008.** The Defendants shall respond within **twenty (20) days** thereafter. The Court will enter final Judgment following consideration of the Plaintiffs' request for statutory damages and attorneys' fees.

**IT IS SO ORDERED.**

5-2-2008
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE